Filed 9/24/13

CERTIFIED FOR PUBLICATION


COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| VINCENT GUY ADAMO, | D062361 |
| Plaintiff and Appellant, | |
| v. | (Super. Ct. No. 37-2009-00065797-CU-IC-EC) |
| FIRE INSURANCE EXCHANGE, | |
| Defendant and Respondent. | |

APPEAL from a judgment of the Superior Court of San Diego County, Joel L. Pressman, Judge.  Affirmed.


Jack B. Winters, Jr., and Georg M. Capielo for Plaintiff and Appellant.

White Oliver Amundson & Gallagher, Susan L. Oliver and Robert E. Gallagher;

Greines, Martin, Stein & Richland LLP, Robert A. Olson and Gary J. Wax, for Defendant

and Respondent.

Plaintiff Vincent Guy Adamo filed a claim under his homeowner's policy after a wildfire damaged his 1,000-tree avocado grove, 10,000-gallon water tank, irrigation system, culverts, two woodsheds, and landscaping on his property. His insurance carrier, defendant Fire Insurance Exchange (FIE), denied coverage for his avocado trees under a commercial use/farming exclusion, but paid him $116,000 for various damages, including the policy's $53,100 policy limit under Coverage B for "other structures." In this action Adamo asserted he was entitled to additional benefits for damages to the 10,000-gallon water tank, irrigation system, and culverts associated with his avocado growing operation under (1) Coverage A for structures that are "attached" to his dwelling; (2) subsection 1 of "Other Coverages" which included "other structures"; or (3) under Coverage A for "building equipment and outdoor equipment used for the service of and located at the Described Location."

This matter came on for a bench trial on stipulated facts. Following trial the court ruled (1) the water tank, piping and other property were not "attached" for Coverage A to apply; (2) none of the property was covered under Coverage A for "building equipment and outdoor equipment"; and (3) subsection 1 of "Other Coverages" did not establish a separate line of coverage but only established the Coverage B policy limits.

On appeal, Adamo asserts the court erred in ruling in favor of FIE because (1) the subject property is "attached" to the main dwelling for purposes of coverage under Coverage A; (2) the property could be considered equipment used to service the property

2

for purposes of coverage under Coverage A; and (3) the "Other Coverages" section of Coverage A provides additional coverage. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

A. *Insurance Policy Language*

FIE insured Adamo under a standard first-party residential property insurance policy. The policy provided two separate categories of coverage for: (1) the "Dwelling" (Coverage A); and (2) "Other Structures" (Coverage B).

Coverage A applies to four sub-categories, all related to or including the dwelling: (a) "the dwelling on the Described Location, used principally for dwelling purposes"; (b) "structures attached to the dwelling"; (c) "materials and supplies on or adjacent to the Described Location for use in the construction, alteration or repair of the dwelling or other structures on this location"; and (d) "if not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location."

Coverage B applies to "other structures on the Described Location, separated from the dwelling by clear space." Specific examples of structures that fall under Coverage B include those "connected to the dwelling by only a fence, utility line or similar connection." The policy excludes "other structures" that would otherwise fall under Coverage B when "used in whole or in part for commercial, manufacturing or farming purposes."

Coverage A and Coverage B have different coverage limits and sub-limits. Coverage A has a $531,000 total liability limit. It also has a $26,500 sub-limit, covering

3

fire or smoke damage to "lawns, plants, shrubs, or trees." A payment under this sub-limit reduces the "Coverage A limit of liability" for the "dwelling" "by the amount paid."

Coverage B for "other structures" has a lower $53,100 limit, which is defined under the heading "Other Coverages" in subsection 1: "Other Structures—You may use up to 10% of the Coverage A limit of liability [i.e., 10 percent of $531,000 or $53,100] for loss by a Peril Insured Against other structures described in Coverage B. Use of this coverage does not reduce the Coverage A limit of liability for the same loss." The declarations page shows a $531,000 policy limit for Coverage A and a $53,100 policy limit for Coverage B.

B. *Damages Adamo Suffered As a Result of the 2007 San Diego Wildfires*

The October 2007 wildfires in San Diego County damaged Adamo's landscaping, retaining wall, two woodsheds (plus their contents), a 1,000-tree avocado grove and "property associated with his avocado grove," including an irrigation system, culverts and a detached 10,000-gallon water tank. Adamo's residence incurred some minor smoke damage, but it didn't burn.

The principal fire damage was to Adamo's landscaping, woodsheds and the water system "associated with [the] avocado grove." The water system (i.e., the water tank, irrigation system, and culverts) was separated from Adamo's dwelling by clear space and was completely detached from the dwelling, except an underground water pipe connecting the dwelling and water tank.

4

C. *FIE's Investigation And Payment To Adamo*

Adamo filed a claim under his policy seeking payment for his damaged property. Adamo admitted to FIE's adjuster that he had sold avocados grown on his property. After completing her initial investigation and damages inventory, FIE's adjuster notified Adamo that damage to the avocado trees was not covered under his policy because he "indicated that they were being used for [a] commercial purpose," and such use is excluded under Coverage B's commercial-use exclusion. FIE did, however, pay Adamo for all the items that the adjuster initially found Adamo's policy did cover: the smoke damage to the house, landscaping, and the two woodsheds plus their contents.

After the first payment, FIE conducted a further investigation of Adamo's claim for additional available coverage, including hiring an expert to evaluate the damages Adamo sustained to his culvert system. FIE reimbursed Adamo under Coverage B for damage to the culverts, which exhausted Coverage B's $53,100 policy limit.

When it made the second payment, FIE informed Adamo that the applicable coverages in his policy had been exhausted and that it did not owe more than the $116,000 it had already paid.

Adamo then sought payment under Coverage A (the "dwelling" coverage) for his water tank and irrigation system as well as additional coverage for damage to his culverts. FIE denied this claim, asserting the water tank was not "attached" to his dwelling for purposes of Coverage A limits, and the property was used for commercial purposes and thus excluded under Coverage B.

D. *The Instant Action*

Adamo sued FIE for breach of contract, bad faith, promissory estoppel, declaratory relief and reformation. The complaint alleged that FIE "refused, and continues to refuse" to reimburse Adamo "for the cost of repair, replacement cost or the actual cash value of [his] . . . irrigation system, or water tank as required by the terms and conditions of [his] policy."

The parties stipulated to try the coverage issue as a threshold matter based on stipulated facts. The court conducted a bench trial to decide the following coverage issue: Whether available coverage remained for the damaged water tank, irrigation system and culverts.

Adamo's theory at trial was that (1) Coverage A provided additional coverage for any structure or equipment that is "physically attached" to the dwelling and "absolutely necessary" for its use; (2) even though Coverage B expressly covers "other structures" "separated from the dwelling by clear space" and connected by a "utility line or similar connection," nothing in the policy precluded concurrent or additional coverage for the same property under Coverage A; (3) even after Coverage B limits have been exhausted, an additional $53,100—i.e., 10% of the limits available in Coverage A—was also available to cover other structures defined in Coverage B; (4) FIE could not enforce the commercial-use exclusion in Coverage B; and (5) the commercial-use exclusion is inconspicuous, unclear and ambiguous.

FIE in turn argued: (1) Adamo's water tank, irrigation system and culverts were not "attached" to the dwelling so there was no coverage available under Coverage A;

6

(2) coverage for the water tank would only be available under Coverage B (for "other structures") because it expressly covered circumstances where, as here, there was "clear space" between the dwelling and other structure, and they were only connected by a "utility line"; (3) because it was undisputed that Coverage B's limit was fully exhausted, no additional benefits were available to Adamo; (4) even if Coverage B's policy limit had not been exhausted, the water tank and other property associated with the avocado grove were not covered because they were used for a commercial purpose; and (5) the commercial-use exclusion was clear, conspicuous and unambiguous.

Following the trial, the court issued a statement of decision, finding in favor of FIE. Specifically, the court found: (1) none of the applicable policy language was ambiguous; (2) coverage for damage to the water tank, the irrigation system and culverts fell under Coverage B and not Coverage A; (3) since Coverage B had already been exhausted, there was nothing left for FIE to pay under the policy; and (4) since there were no policy benefits due, there could be no breach of contract or bad faith.

The court did not address the commercial-use exclusion.

Adamo moved for a new trial on various grounds, including surprise and newly-discovered evidence. In support of his motion, Adamo presented an expert declaration and an insurance industry bulletin that asserted the "other coverages" section of his policy provided a "distinct and separate category from which coverage is still available." Adamo's claim of surprise was FIE's alleged change of position that the "other coverages" section was a separate category of coverage.

7

The court denied Adamo's new trial motion. The court found that he "failed to meet his burden on any of the grounds he raised in his motion or otherwise." It also sustained FIE's objections to Adamo's newly proffered expert testimony and insurance industry bulletin.[1]

DISCUSSION

I. *STANDARD OF REVIEW*

Where, as here, the relevant facts are stipulated, the meaning and interpretation of the policy provisions at issue are reviewed de novo under well-settled rules of contract interpretation. (*E.M.M.I. Inc. v. Zurich American Ins. Co.* (2004) 32 Cal.4th 465, 470; *Employers Mut. Cas. Co. v. Philadelphia Indem. Ins. Co.* (2008) 169 Cal.App.4th 340, 347.) Moreover, whether or not a policy provision is ambiguous is reviewed de novo as are the objectively reasonable expectations of coverage. (*Union Oil Co. v. International Ins. Co.* (1995) 37 Cal.App.4th 930, 936.)

II. *ANALYSIS*

A. *Applicable Authority*

"While insurance contracts have special features, they are still contracts to which the ordinary rules of contractual interpretation apply." (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1264.) "The rules governing policy interpretation require

---

[1]    On appeal, Adamo does not challenge the propriety of the court's denial of his new trial motion, or the admissibility of the proffered extrinsic evidence. Thus, any such argument has been waived. (See *Paulus v. Bob Lynch Ford, Inc.* (2006) 139 Cal.App.4th 659, 685.)

us to look first to the language of the contract . . . to ascertain its plain meaning or the meaning a layperson would ordinarily attach to it." (*Waller v. Truck Ins. Exchange, Inc.* (1995) 11 Cal.4th 1, 18.) "The fundamental rules of contract interpretation are based on the premise that the interpretation of a contract must give effect to the 'mutual intention' of the parties . . . . 'Such an intent is to be inferred, if possible, solely from the written provisions of the contract. [Citation.] The "clear and explicit" meaning of these provisions, interpreted in their "ordinary and popular sense," unless "used by the parties in a technical sense or a special meaning is given to them by usage" [citation], controls judicial interpretation. [Citation.]' [Citations.]" (*Ibid.*)

"Ambiguity exists when an insurance policy provision is susceptible to two or more constructions that are reasonable and not based on strained interpretations." (*Shell Oil Co. v. Winterthur Swiss Ins. Co.* (1993) 12 Cal.App.4th 715, 737.) " '[L]anguage in a contract must be construed in the context of that instrument as a whole, and in the circumstances of that case, and cannot be found to be ambiguous in the abstract.' " (*Bank of the West v. Superior Court*, *supra*, 2 Cal.4th at p. 1265, italics omitted.) If "a term in an insurance policy has been judicially construed, it is not ambiguous and the judicial construction of the term should be read into the policy unless the parties express a contrary intent." (*Bartlome v. State Farm Fire & Casualty Co.* (1989) 208 Cal.App.3d 1235, 1239.)

B. *The Trial Court Did Not Err In Finding FIE Owed No Additional Coverage*

The $53,100 coverage for "other structures" was the only coverage available for Adamo's water system. Coverage B for "other structures" applies to the 10,000-gallon

9

water tank, irrigation system and culverts because Coverage B defines "other structures" as those "separated from the dwelling by clear space."  Although the policy does not define the phrase "clear space" it has a plain meaning based on common understanding. It refers to an open area.

Moreover, Coverage B's definition also contains a non-exhaustive list of "other structures" that it covers, including structures, like the water tank, connected to the dwelling only by a "utility line or similar connection."  Adamo concedes that the water tank is "only connected to the dwelling by a water pipe."  Various statutes in this state define "utility service" as including water service.  (See Civ. Code, § 1001; Pub. Util. Code §§ 12819.5, 16480.5; Pen. Code, § 498.)

Adamo contends, however, that there is some ambiguity in the language used in Coverage B because the terms "clear space" and "utility line" are undefined.  This contention is unavailing.  The lack of a policy definition for every word used does not create ambiguity where none otherwise exists.  (*Bay Cities Paving & Grading, Inc. v. Lawyers' Mutual Ins. Co.* (1993) 5 Cal.4th 854, 866.)  The terms "clear space" and "utility line" have common sense meanings.  Further, even if the water pipe somehow was not a "utility line," it is a "similar connection," that would still keep it within Coverage B's coverage.

Although no California cases have interpreted this exact policy language, a federal case has interpreted this language and found it unambiguous.  (*Porco v. Lexington Ins. Co.* (S.D.N.Y. 2009) 679 F.Supp.2d 432, 439-440 (*Porco*) ["the Court has found no decisions holding that the plain language used in Coverage A and Coverage B is

10

ambiguous"].)  As in this case, in *Porco* the court interpreted the phrase "set apart from the dwelling by clear space . . . [and] connected to the dwelling by only a fence, utility line or similar connection."  (*Id.* at p. 434.)  As with the water tank and dwelling here, clear space separated the disputed damaged property, a swimming pool, from the dwelling and a water pipe connected the two structures.  (*Id*. at p. 439.)

Reading Coverage B's language in conjunction with Coverage A, the court in *Porco* had "little difficulty" in concluding that the swimming pool unambiguously fell within Coverage B ("other structures") and not within Coverage A ("dwelling").  (*Porco*, *supra*, 679 F.Supp.2d at pp. 439-441.)  The court held that "the connection between the pool and the dwelling through the filtering pipes is precisely the type of 'similar connection' to a 'utility line' that also defines 'other structures' in Coverage B."  (*Id*. at p. 439.)  The court concluded that because the damage fell under Coverage B, as a matter of law it could not also fall under Coverage A.  (*Id*. at p. 441.)

Thus, because Coverage B's $53,100 limit was fully paid, there was no additional coverage for "other structures."   It is undisputed that after FIE's second payment to Adamo, there was "no more available coverage under the policy under Coverage B since the policy limits ha[d] been paid."

An insurance carrier is permitted to set policy limits on a homeowner's fire policy. (*Everett v. State Farm General Ins. Co.* (2008) 162 Cal.App.4th 649, 656.)  "It is up to the insured to determine whether he or she has sufficient coverage for his or her needs." (*Id*. at p. 660.)  In this case, Adamo purchased a policy that expressly capped benefits

11

when the policy's limits were met: "[W]e shall not be liable [¶] . . . [¶] for more than the limit of liability that applies."

Accordingly, FIE was not in breach of Adamo's policy for refusing to pay additional amounts for "other structures" because no additional coverage was available under Coverage B.

Adamo contends that even though Coverage B's $53,100 limit was fully paid and exhausted, additional coverage exists because "the stipulated facts and the policy language established coverage was still available to indemnify for the loss" under Coverage A's $531,000 limit. Adamo argues that both Coverage A and Coverage B should apply to the *same loss* suffered as to the same property. We reject this contention.

As we have stated, *ante*, insurance policies are to be read as a whole. That means where multiple coverages are afforded, they are read as covering different, separate items. (*Fibreboard Corp. v. Hartford Accident & Indemnity Co.* (1993) 16 Cal.App.4th 492, 509 (*Fibreboard*) [interpreting premises liability coverage in light of fact that separate products liability coverage was provided].)

It appears that Adamo is asserting that when the applicable coverage's limits have been exhausted, payment should be made under another *inapplicable* coverage. A common sense reading of the policy means giving *effect* to the language in Coverage B, not ignoring it. (*Employers Reinsurance Co. v. Superior Court* (2008) 161 Cal.App.4th 906, 911, fn. 2 [finding that coverages for products and non-products "are complementary and not overlapping"].)

12

In the policy at issue here, the plain language and physical relationship between Coverage A and Coverage B dictate that the two coverages are mutually exclusive, not compounded. Coverage B for "other structures" immediately follows Coverage A for the "dwelling." In addition, "other structures" are defined in relationship to the "dwelling." They must be "separated from the dwelling by clear space" to qualify. Property is covered under either Coverage A or B, not both. Structures covered under Coverage B are structures "other" than, and distinct from, those covered under Coverage A. (See Black's Law Dict. (6th ed. 1990) p. 1101, col. 1 [defining "Other" as "Different or distinct from that already mentioned".)

Moreover, nothing in the plain language of Coverage A would afford coverage to the 10,000-gallon water tank, irrigation system and culverts because they are not "attached" to the dwelling as required for Coverage A to apply.

The ordinary meaning of the word "attached" in the context of Coverage A "is the physical union [or joining of two] structures." (Black's Law Dict., *supra*, at p. 125, col. 2.) The irrigation system and culverts are not physically attached in any way to the dwelling. Therefore, they are not covered under subparagraph (b).

Adamo asserts the water tank falls under Coverage A because it is "integral and necessary for legal occupancy" and thus, "reasonably considered part of the home." However, the policy does not contain any such "integral and necessary" language.

The only case Adamo cites in support of this proposition is *Meyerstein v. Great American Ins. Co.* (1927) 82 Cal.App. 131 (*Meyerstein*). However, that case dealt with different policy language. There, the sole issue was how the word "additions" should be

13

interpreted. At issue was whether the parties intended to cover a separate laundry building and water tank as "additions" in connection with the main building. (*Id.* at p. 134.)

"Additions" coverage is not at issue here. Moreover, the policy in *Meyerstein* had no separate, express coverage for "other structures." Thus, *Meyerstein* does not assist our analysis.

Adamo also relies on Coverage A, subparagraph (d), which states "if not otherwise covered in this policy, building equipment and outdoor equipment used for the service of and located on the Described Location." Adamo contends that this is a "catch-all provision" duplicatively covering "[a]nything related to the occupation, use, and function of the entire property" even if the property is covered elsewhere in the policy as it is in Coverage B. According to Adamo's interpretation, where policy limits have been met, the loss "if not 'otherwise covered' " for purposes of Coverage A, subparagraph (d). Adamo provides no authority for this proposition. He merely argues that this interpretation is "objectively reasonable."

However, as the trial court found in rejecting this argument, prior to full payment of the Coverage B policy limit, the water system was " 'otherwise covered' under Coverage B," and therefore, subparagraph (d) does not apply. Adamo's strained interpretation cannot create an ambiguity where none exists. (*Reserve Insurance Co. v. Pisciotta* (1982) 30 Cal.3d 800, 807; *Bosetti v. U.S. Life Ins. Co. in City of New York* (2009) 175 Cal.App.4th 1208, 1227.) The water system is "otherwise covered" under

Coverage B.  This "catch-all" provision is for property not otherwise covered, not for covered property once a policy limit is exhausted.

The plain language of subdivision (d) applies only where the policy provides no other coverage.  Here, the property at issue is "otherwise covered" under Coverage B.

Adamo argues that where the loss has not been fully paid, but Coverage B's $53,100 limit has been exhausted, "Other Coverages, Subsection 1" provides "an additional benefit under the policy allowing [Adamo] to use 10 percent for whatever [he] want[s] elsewhere" beyond the limits stated on the policy's declarations page.  This contention is unavailing.

As the court found, "Other Coverages, Subsection 1" is "a quantitative definition" of the policy limits for the various coverages, including Coverage B.

In other words, Coverage B's limit is calculated under "Other Coverages, Subsection 1."  Coverage B's limit is 10 percent of Coverage A.  That amount is $53,100, because it is 10 percent of Coverage A's $531,000 limit shown on the declarations page. That same 10 percent number, $53,100, is reflected as the Coverage B policy limit on the declarations page.

In support of this assertion, Adamo cites to the two pieces of extrinsic evidence that Adamo attached, for the first time, to his new trial motion:  an insurance industry bulletin and an expert declaration.  However, in denying the new trial motion, the trial court rejected Adamo's claim of surprise or newly discovered evidence and sustained

15

FIE's objections to the bulletin and expert declaration. Adamo has not challenged those rulings on appeal. (See p. 8, fn. 1, *ante*.)

Moreover, this extrinsic evidence is inadmissible to interpret the policy because, as we have already concluded, the policy language was unambiguous. There must be "a showing of ambiguity before extrinsic evidence may be admitted to shed light on that ambiguity." (*ACL Technologies, Inc. v. Northbrook Property & Casualty Ins. Co.* (1993) 17 Cal.App.4th 1773, 1790-1791; see also *Fire Ins. Exchange v. Superior Court* (2004) 116 Cal.App.4th 446, 457 [rejecting plaintiff's request to consider extrinsic evidence to interpret terms where the policy's terms were explicit, clear and unambiguous]; *Transport Indem. Co. v. American Fid. & Cas. Co.* (1970) 4 Cal.App.3d 950, 960 [where policy language is unambiguous, expert testimony is inadmissible]).[2]

## DISPOSITION

The judgment is affirmed. FIE shall recover its costs on appeal.

NARES, J.

WE CONCUR:

BENKE, Acting P. J.

McINTYRE, J.

---

[2]    Because we have concluded that no additional coverage exists, we need not address the policy's commercial-use exclusion raised by FIE, or Adamo's claim that FIE acted in bad faith.

16